UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DAVID L. STRATMON, JR., | ) | 1:10-cv-00127 MJS HC |
| Petitioner, | ) ) | ORDER REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ) ) | |
| H.A. RIOS, Warden, | ) ) | |
| Respondent. | ) ) | |
| _____ | ) | |

Plaintiff is a federal prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.

**I.      JURISDICTION**

   **A.      Subject Matter Jurisdiction**

Relief by way of a writ of habeas corpus extends to a prisoner in custody under the authority of the United States who shows that the custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c)(3). Although a federal prisoner who challenges the validity or constitutionality of his conviction must file a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255, a federal prisoner challenging the manner, location, or conditions of the execution of a sentence must bring a petition for writ of habeas corpus under 28 U.S.C. § 2241. Hernandez v. Campbell, 204 F.3d 861, 864-65 (9th Cir. 2000). A petitioner

filing a petition for writ of habeas corpus under 28 U.S.C. § 2241 must file the petition in the judicial district of the petitioner's custodian. Brown, 610 F.2d at 677. Petitioner is currently in custody of the United States Penitentiary located in Atwater, California, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d). Here Petitioner presents challenges to his hearing before the United States Parole Commission. Accordingly, Petitioner's claim is properly brought by way of a petition for writ of habeas corpus under 28 U.S.C. § 2241.

### B.     Jurisdiction over the Person

Title 28 U.S.C. § 2241(a) provides that writs of habeas corpus may be granted by the district courts "within their respective jurisdictions." A writ of habeas corpus operates not upon the prisoner, but upon the prisoner's custodian. Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 494-495 (1973). A petitioner filing a petition for writ of habeas corpus under § 2241 must file the petition in the judicial district of the Petitioner's custodian. Brown v. United States, 610 F.2d 672, 677 (9th Cir. 1990). The warden of the penitentiary where a prisoner is confined constitutes the custodian who must be named in the petition, and the petition must be filed in the district of confinement. Id.; Rumsfeld v. Padilla, 542 U.S. 426, 446-47 (2004). It is sufficient if the custodian is in the territorial jurisdiction of the court at the time the petition is filed; transfer of the petitioner thereafter does not defeat personal jurisdiction that has once been properly established. Ahrens v. Clark, 335 U.S. 188, 193, 68 S. Ct. 1443, 92 L. Ed. 1898 (1948), overruled on other grounds in Braden, 410 U.S. at 493, citing Mitsuye Endo, 323 U.S. 283, 305 (1944); Francis v. Rison, 894 F.2d 353, 354 (9th Cir. 1990). A failure to name and serve the custodian deprives the Court of personal jurisdiction. Johnson v. Reilly, 349 F.3d 1149, 1153 (9th Cir. 2003).

Here, at all pertinent times, Petitioner was incarcerated at the United States Penitentiary located in Atwater, which is located within the Eastern District of California. Petitioner named H.A. Rios, the Warden of the United States Penitentiary, as Respondent.

Accordingly, the Court concludes that it has personal jurisdiction over the custodian.

## II.     BACKGROUND

On April 8, 1985, the Superior Court of the District of Columbia sentenced Petitioner to 12 to 36 years in prison for murder II. (Answer, Ex. A.) On April 8, 1985, he also received a consecutive sentence of 15 years to life for assault with intent to kill while armed and assault with intent to rape while armed. (Id., Ex. B.) The United States Parole Commission ("USPC") conducted Petitioner's first parole hearing on May 30, 2003. (Id., Ex. C.) The hearing examiner determined that Petitioner had committed six institutional violations while incarcerated: possession of contraband, possession of major contraband, threatening conduct, major contraband (possession of a marijuana pipe and a weapon), failure to cooperate, and possession of intoxicants. (Id.) The USPC recommended denial of parole and a reconsideration hearing in five years because Petitioner was well below his guideline range in terms of months in custody; his offense conduct was violent in nature; and because of his prior history of violence. (Id. at 5.) On June 23, 2003, the USPC denied Petitioner parole and continued his case to a five year reconsideration hearing in May 2008. (Id., Ex. D.)

On February 4, 2008, a pre-hearing assessment was performed prior to Petitioner's reconsideration hearing. (Id., Ex. E.) According to the evaluation section of the assessment, Petitioner had not participated in a sex offender program and would be viewed as a "Untreated Sexual Predator/Power Rapist." (Id. at 4.) Petitioner received his reconsideration hearing on February 25, 2008. (Id., Ex. F.) The hearing examiner found that Petitioner committed the institutional infraction of possession of a dangerous weapon since his last hearing. (Id.) The hearing examiner recommended denial of parole and a reconsideration hearing in three years because Petitioner had not reached the bottom of his guideline range. (Id.) By Notice of Action, dated March 12, 2008, the USPC denied parole and continued Petitioner's case to a rehearing in February 2011. (Id., Ex. G.)

## III.    PETITIONER'S CLAIMS

Petitioner alleges that the Bureau of Prisons has wrongfully denied him parole. Specifically, Petitioner contends the USPC's application of its 2000 guidelines to offenders from the District of Columbia constitutes an Ex Post Facto violation of the United States

Constitution. Petitioner also contends the USPC's February 28, 2008, decision to deny him parole denied him due process by failing to apply the proper guidelines, relying on erroneous information, and arbitrarily changing his disciplinary guideline range.

## IV. ANALYSIS

### A. Parole Under District of Columbia Law

In the days of indeterminate sentencing, the Superior Court of the District of Columbia sentenced a convicted felon "for a maximum period not exceeding the maximum fixed by law, and for a minimum period not exceeding one-third of the maximum sentence imposed," after which the prisoner "may be released on parole . . . ." D.C. Code § 24-403(a). The District of Columbia Board of Parole ("Parole Board") could parole a prisoner if it found that "there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his . . . release is not incompatible with the welfare of society, and that he . . . has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be." D.C. Code § 24-404(a). Initially there was "no formalized scoring system" in place, and the Parole Board only "was required by regulation to consider factors such as the inmate's offense, prior history of criminality, personal and social history, . . . [and] institutional experience, . . . when exercising its discretion to authorize parole." Davis v. Henderson, 652 A.2d 634, 635 (D.C. 1995). In short, "parole eligibility was determined by a . . . Board that operated with nearly complete discretion." Wilson v. Fullwood, 772 F. Supp. 2d 246, 252 (D.D.C. 2011) (citing Austin v. Reilly, 606 F. Supp. 2d 4, 8 (D.D.C. 2009)). The Parole Board subsequently developed and published regulations, see D.C. Mun. Regs. tit. 28, § 100 et seq. (1987) (repealed Aug. 5, 2000) ("1987 Regulations"), in an effort to "mak[e] explicit those factors that [would] be considered in each [individual] case." Sellmon v. Reilly, 551 F. Supp. 2d 66, 69 (D.D.C. 2008) (citations omitted and emphasis removed).

Pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997 ("Revitalization Act"), Pub. L. No. 105-33, 111 Stat. 712 (1997), the Parole Board was abolished. See D.C. Code § 24-131(b). The USPC assumed authority to grant, deny, impose or modify conditions of, and revoke parole for District of Columbia Code felony offenders, see

id. § 24-131(a)(1), (2), and "amend or supplement any regulation interpreting or implementing the parole laws of the District of Columbia with respect to felons." Id. § 24-131(a)(1); see id. § 24-131(c). In 2000, the USPC issued new guidelines for determining whether an inmate is eligible for parole. See generally 63 Fed. Reg. 39172 (July 21, 1998). These guidelines lie at the heart of Petitioner's claims. Because analysi of the differences among the various parole regimes are essential to the Court's legal analysis, the Court discusses these regulations in further detail below.

### 1.    The 1972 Regulations

From 1932 to 1997, the Parole Board was vested with the authority to grant parole to prisoners sentenced under D.C. law. See Austin v. Reilly, 606 F. Supp. 2d 4, 8 (D.D.C. 2009). Prior to 1972, the relevant provision of the District of Columbia Code ("D.C. Code") stated:

> Whenever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the Board may authorize his release on parole upon such terms and conditions as the Board shall from time to time prescribe.

Id. (quoting D.C. Code § 24-204 (1973)).

In 1972, the Parole Board promulgated a set of regulations outlining a list of non-exclusive factors that it could consider when determining whether an inmate was suitable for parole. Wilson v. Fullwood, 772 F. Supp. 2d 246, 252 (D.D.C. 2011). These regulations granted the Board "nearly complete discretion" to determine whether parole was appropriate. Id. The factors that the Board could consider when making parole decisions included:

> (a) The offense, noting the nature of the violation, mitigating or aggravating circumstances and the activities and adjustment of the offender following arrest if on bond or in the community under any presentence type arrangement;
>
> (b) Prior history of criminality noting the nature and pattern of any prior offenses as they may relate to the current circumstances;
>
> (c) Personal and social history of the offender, including such factors as his family situation, educational development, socialization, marital history, employment history, use of leisure time and prior military experience, if any;
> (d) Physical and emotional health and/or problems which may have played a role in the individual's socialization process, and efforts made to overcome any such problems;

(e) Institutional experience, including information as to the offender's overall general adjustment, his ability to handle interpersonal relationships, his behavior responses, his planning for himself, setting meaningful goals in areas of academic schooling, vocational education or training, involvements in self-improvement activity and therapy and his utilization of available resources to overcome recognized problems. Achievements in accomplishing goals and efforts put forth in any involvements in established programs to overcome problems are carefully evaluated;

(f) Community resources available to assist the offender with regard to his needs and problems, which will supplement treatment and training programs begun in the institution, and be available to assist the offender to further serve in his efforts to reintegrate himself back into the community and within his family unit as a productive useful individual.

Id. (citing 9 D.C.R.R. ch.2, § 105.1 (1972)).

### 2.  The 1987 Regulations

In 1985, the Parole Board formally adopted new regulations, which were codified in 1987 ("1987 Regulations"). Sellmon v. Reilly, 551 F. Supp. 2d 66, 69 (D.D.C. 2008) (citing D.C. Mun. Regs. tit. 28, § 100 (1987)). In order to structure the Parole Board's discretion and promote consistency in its parole release decisions, the 1987 Regulations outlined four explicit factors that the Board would consider in each inmate's case. Sellmon, 551 F. Supp. 2d at 70. The Board would award or take away points for each factor, in order to arrive at a "total point score" indicating whether the prisoner was suitable for parole. Id.

The first two factors in this formula used information known at the time of incarceration, and the other two were based on post-incarceration information. D.C. Mun. Regs. tit. 28, § 100 (1987). The factors that the Parole Board would consider were the inmate's "degree of risk" to offend again, the "type of risk" that he posed, his "institutional adjustment" and his "program participation." Id.

The first factor, the prisoner's "degree of risk," was based on a Salient Factor Score ("SFS"), an actuarial device assessing an inmate's "degree of risk" known at the time of his incarceration. Id. In calculating a prisoner's SFS, the Parole Board would consider six factors: (1) prior convictions and adjudications; (2) prior commitments of more than thirty days; (3) age at the commission of current offense; (4) recent commitment-free period; (5) status of prisoner at the time of the current offense; and (6) history of heroin or opiate dependence. See D.C.

Mun. Regs. tit. 28, §§ 204.4-204.17 (1987). In turn, the prisoner's SFS placed him in one of four risk categories: low; fair; moderate; or high risk. Id. § 204.17. Each category also corresponded to a numerical score, allowing the Parole Board to apply a baseline score to each prisoner. Sellmon, 551 F. Supp. 2d at 70 (citing D.C. Mun. Regs. tit. 28, § 100 (1987)).

The Board would then alter this baseline score by taking into account the other three factors required to determine the prisoner's "total point score." Id. The second factor, the "type of risk," required examining whether the prisoner's current or past offenses involved violence, weapons or drug trafficking. Id. (citing D.C. Mun. Regs. tit. 28, § 204.18 (1987)). If any of these risk factors was present, the Board would add a point to the prisoner's baseline score. Id.

Regarding the third factor of "institutional adjustment," if the inmate's disciplinary infractions were serious or repetitive, the Board would add a point for "negative institutional behavior" to the baseline score. Id. at 70-71. For the fourth factor of "program achievement," the Board would subtract a point from the baseline score if the prisoner's program or work accomplishments were sufficiently substantial. Id. Upon calculating the total point score, the Board would then determine whether parole should be granted or denied. Id.

### 3.    Abolition of the D.C. Parole Board and the 2000 Guidelines

In August 1997, Congress enacted the National Capital Revitalization and Self-Governance Improvement Act, which transferred management of the District of Columbia prison system to federal authority. See generally D.C. Code §§ 24-101. The Act abolished the D.C. Parole Board and directed the USPC to conduct parole hearings for D.C. inmates. Sellmon, 551 F. Supp. 2d at 68.

After assuming jurisdiction over D.C. Code offenders, the USPC promulgated a series of amendments to the 1987 Regulations. Id. In 2000, the USPC issued revised guidelines to "promote both increased fairness and administrative efficiency." See generally 63 Fed. Reg. 39172 (July 21, 1998). Like the 1987 Regulations, the 2000 Guidelines use a scoring system to determine whether a prisoner is presumptively suitable for parole. 28 C.F.R. § 2.80(c). In calculating the SFS, the USPC determines a prisoner's "degree of risk." Id. As with the 1987 Regulations, this degree of risk places an inmate in one of four risk categories with its own

numerical score. Id. § 2.80(f).

Furthermore, like the 1987 Regulations, the 2000 Guidelines determine the "type of risk" that inmates pose by evaluating static, pre-incarceration factors. Id. § 2.80(f)-(g). After calculating both the prisoner's degree and type of risk, the resulting "base point score" is converted into a "base guideline range," or a number of months that are added to the prisoner's court-imposed minimum sentence. Id. § 2.80(h). Once the USPC adds the base guideline range to the prisoner's minimum sentence, it also adds or subtracts months to account for negative institutional behavior or "superior" program achievement. Id. § 2.80(j)-(k). In addition, the USPC retains sole discretion to categorize inmate behavior as either "superior" or "non-superior," and only the former may result in a sentence reduction. Id. § 2.80(e). The resulting total number of months is known as the "total guideline range," which "indicates the customary range of time to be served, except in unusual circumstances [where the USPC may depart from the total guideline range], before release." Id.

### B.     Legal Standard for an Ex Post Facto Violation

The Ex Post Facto Clause of the United States Constitution prohibits retroactive increases in criminal punishment. See U.S. Const. art. I, § 9, cl. 3; Collins v. Youngblood, 497 U.S. 37, 42-43 (1990). A retroactively applied parole regulation, guideline or policy statement may violate the Ex Post Facto Clause if it creates "a significant risk" of "a longer period of incarceration than under the earlier rule." Garner v. Jones, 529 U.S. 244, 255 (2000). Thus, "determin[ing] whether . . . retroactive application of a new parole regime violates the Ex Post Facto Clause requires a 'searching comparison' of the two parole regimes." Sellmon, 551 F. Supp. 2d 66, 84 (D.D.C. 2008) (citing Fletcher v. Reilly, 433 F.3d 867, 879, 369 U.S. App. D.C. 100 (D.C. Cir. 2006) ("Fletcher III")). "Sometimes . . . a risk [of a longer period of incarceration] will be apparent from facial differences between the old and new rule. But 'when the rule does not by its own terms show a significant risk, the prisoner must demonstrate'" that the "practical" effect of the new rule will be "a longer period of incarceration than under the earlier rule." Phillips v. Fulwood, 616 F.3d 577, 580-81 (D.C. Cir. 2010) (quoting Garner, 529 U.S. at 255 (alterations omitted)).

The "controlling inquiry" is "one of practical effect." Fletcher III, 433 F.3d at 877. Thus, the Court "must assess the magnitude of the risk in terms of the practical effect of the change in regulations on the length of a [prisoner's] incarceration." Id. In other words, "plaintiffs may not prevail simply by showing facial differences between the old and new policies. Rather[,] plaintiffs must demonstrate that the practical effect of the new policies was to substantially increase the risk that they would [each] serve lengthier terms of incarceration." Sellmon, 551 F. Supp. 2d at 91.

### C. Petitioner's Allegations Do Not Plausibly Suggest That the 2000 Guidelines Significantly Risk a Lengthier Incarceration Period Than the 1972 Regulations

Petitioner claims that retroactively applying the 2000 Guidelines created a significant risk of prolonged incarceration, as compared to the 1972 or 1987 Regulations. (Pet. at 3.)

First this Court agrees with the decisions of the United States District Court for the District of Columbia that it is appropriate to compare the 2000 Guidelines to the 1972 Regulations, rather than the 1987 Regulations:

> [P]re- and post-1987 Board's practices are too speculative to allow plaintiffs convicted before 1987 to rely on the 1987 Regulations when arguing an ex post facto violation. Sellmon v. Reilly, 561 F. Supp. 2d 46, 49 (D.D.C. 2008). The Board's "almost unbridled discretion to grant parole" under the 1972 Regulations stands in stark contrast to the 1987 Regulations, which employed a scoring system to structure the Board's discretion. Compare D.C. Mun. Regs. tit. 28, § 100 (1987), with 9 D.C.R.R. ch.2, § 105.1 (1972). As the Sellmon court noted, "the pre-1987 Regulations are thus of minimal help in demonstrating how the Board exercised its discretion in practice prior to 1987." Sellmon, 551 F. Supp. 2d at 86 n.15; see also Wilson, 772 F. Supp. 2d at 266-67 (declining to apply the 1987 Regulations instead of the 1972 Regulations because "a plaintiff may invoke an ex post facto protection only on the basis of the parole regime that was in effect at the time he committed his offense").

Daniel v. Fulwood, 823 F. Supp. 2d 13, 20-21 (D.D.C. 2011).

Accordingly, the Court declines to treat the 1972 and 1987 Regulations as interchangeable. Consequently, the Court turns to analyze the facial and practical differences between the 1972 Regulations and 2000 Guidelines that Petitioner alleges give rise to an ex post facto claim.

In order to succeed on an ex post facto claim, a prisoner may use the facial differences

between an "old and new rule" to demonstrate that applying the newer rule creates a significant risk of a prolonged incarceration period. Phillips v. Fulwood, 616 F.3d at 580-81. The parole determinations under the 1972 Regulations were made in an unbridled, discretionary fashion, quite unlike the methodical and controlled decision-making that would occur under the 2000 Guidelines. Thus, Petitioner faces great difficulty in pleading sufficient facts from which this Court can reasonably infer that facial distinctions between the 1972 Regulations and the 2000 Guidelines significantly risk prolonging Petitioner's incarceration. Yet this is precisely what Petitioner must allege in order to sufficiently plead an ex post facto claim based on the relevant facial differences. See California Dep't of Corrections v. Morales, 514 U.S. 499, 506 n.3 (1995) (stating that "the focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change . . . increases the penalty by which a crime is punishable"); see also Phillips v. Fulwood, 616 F.3d at 581 ("In general, ex post facto claims require a comparison of the challenged scheme to the one in place when the prisoner committed his crimes."). The Court determines that Petitioner has failed to sufficiently allege a plausible claim for an ex post facto violation based on the relevant facial differences and is not entitled to habeas relief. Fletcher, 433 F.3d at 877.

Further, due to the extremely broad discretion that the Parole Board possessed under the 1972 Regulations, there remains no reasonably reliable method of comparing a particular petitioner's incarceration period under the 1972 Regulations, as opposed to under the 2000 Guidelines. Wilson, 772 F. Supp. 2d at 266-67. It appears therefore that any comparison of Petitioner's incarceration period under the two regulatory regimes would be speculative. Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 509 (1995) (noting that an Ex Post Facto claim cannot be based on the speculative possibility that the new rule will increase an individual's punishment). Accordingly, the Court cannot reasonably infer from the Petitioner's alleged facts that there is a significant risk of prolonged incarceration under the 2000 Guidelines. Petitioner has not made a sufficient showing of an ex post facto violation and is not entitled to habeas relief. Daniel v. Fulwood, 823 F. Supp. 2d 13, 20-21.

### D. Petitioner's Due Process Claims

The Petitioner also alleges that the Commission's retroactive application of the 2000 Guidelines violated the Due Process Clause of the Fifth Amendment. Petitioner's claim must fail. There is no direct constitutional liberty interest in parole. Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1 (1979). A liberty interest can only be created if it is articulated in mandatory statutory or regulatory language placing substantive limits on official discretion. See Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 462-63 (1989). Federal courts have concluded that the 1972 Regulations are so "discretionary and open-ended" that they cannot give rise to a due process claim. Blair-Bey v. Quick, 151 F.3d 1036, 1048 (D.C. Cir. 1998); Price v. Barry, 53 F.3d 369, 371 (D.C. Cir. 1995) (per curiam). The 1972 Regulations created no "expectancy of release," and thus Petitioner "cannot claim a liberty interest entitling [Petitioner] to due process protections," as the Regulations did not impose substantive limitations on the Parole Board's discretion. Price v. Barry, 53 F.3d at 371. Likewise, the 2000 Guidelines also do not create a liberty interest in parole. Accordingly, because no constitutionally recognized liberty interest can arise from parole determinations, the Court denies Petitioner's due process claims.

## V. CERTIFICATE OF APPEALABILITY

"The plain language of [28 U.S.C.] § 2253(c)(1) does not require a petitioner to obtain a [certificate of appealability] in order to appeal the denial of a § 2241 petition." Harrison v. Ollison, 519 F.3d 952, 958 (9th Cir. 2008). "Nor is there any other statutory basis for imposing a [certificate of appealability] requirement on legitimate § 2241 petitions. Although state prisoners proceeding under § 2241 must obtain a [certificate of appealability], see § 2253(c)(1)(A), there is no parallel requirement for federal prisoners." Id.

Accordingly, because Petitioner is a federal prisoner bringing a legitimate § 2241 petition, a certificate of appealability is not required.

## VI. ORDER

Accordingly, IT IS HEREBY ORDERED:

1) The petition for a writ of habeas corpus is DENIED; and

   2) The Clerk of Court is DIRECTED to enter judgment and close the case.

IT IS SO ORDERED.

Dated:   March 28, 2013            /s/ *Michael J. Seng*
                                   UNITED STATES MAGISTRATE JUDGE